THE HEIRS OF GENERAL LAFAYETTE, PLAINTIFFS IN ERROR,
v. JOSEPH KENTON ET AL. THE HEIRS OF GENERAL LA-
FAYETTE, PLAINTIFFS IN ERROR, v. EDWARD C. CARTER ET
AL.

By acts of congress passed in 1803 and 1805, General Lafayette was authorized to
locate land warrants upon any lands which were the property of the United States;
to have surveys executed, and to obtain a certificate from the register of the land
office, that the land surveyed was not rightfully claimed by any other person.

The location was made upon land in the vicinity of New Orleans, and included land
which was vacant, and also land which was claimed by individuals. But the entry
contained no exterior boundaries.

It was not until 1825 that the location was surveyed; and then there were marked
upon the plat such lands as were vacant, and such as were claimed by individuals.
The register certified that the lands contained in the survey were vacant, with the
exception of the parts designated as private claims; and a patent was issued for
such vacancies, having the survey attached to it.

These claims of individuals having been confirmed by operation of acts of congress,
are excepted from the grant of the patent. Apart from the documents which estab-
lish the titles of these individual claimants, the patent shows that nothing was
granted except the lands which were marked as vacant.

THESE cases were brought up by writ of error from the circuit
court of the United States, for the eastern district of Louisiana.

They were argued by *Mr. Taylor*, for the plaintiffs in error,
and *Mr. Benjamin* and *Mr. Janin*, for defendants.

The arguments of counsel were so connected with the maps
which were produced in court, that it would be difficult to
present to the reader a clear explanation of them without the
map.

Mr. Justice CATRON delivered the opinion of the court.

By an act of 1803, congress authorized the secretary of war,
to issue to Major-General Lafayette, land warrants, amounting in
all, to 11,520 acres. By the act of March 2, 1805, he was author-
ized to locate his warrants on any lands, " the property of the
United States," within the Orleans territory; the locations to
be made with the register of a land-office established there, and
the surveys were to be executed under the authority of the sur-
veyor of the public lands south of Tennessee. Patents were
directed to be issued, when surveys of the respective tracts were
presented to the secretary of the treasury, " together with a cer-
tificate of the proper register, (in each case,) stating that the
land surveyed was not rightfully claimed by any other person."
And the act further provided, that no location should include
any improved lands or lots.

By an act passed in 1806, entries were authorized for any
quantity of land not less than five hundred acres.

17*

On the 26th day of November, 1807, General Lafayette (by his agent) located 503 acres, calling for " vacant land situated beyond the line of six hundred yards lately abandoned by congress to the corporation of the said city, round the fortifications of the same."

Owing to the unsettled state of private land claims near the city of New Orleans, the location was not surveyed until March, 1825, when the principal surveyor certified to the register that he had surveyed for General Lafayette, " a tract of land situate in the parish of Orleans, beyond the line of six hundred yards abandoned by congress to the corporation of the city of New Orleans, having such courses, distances, boundaries, and contents, as are represented in the annexed plat of survey."

Pursuant to the act of March 2, 1805, the register certified that " the lands contained in the survey returned to his office were vacant, with the exception of the parts designated as private claims."

On the 4th day of July, 1825, a patent issued, which, by its recitals, describes the out-boundaries of the 503 acres, and then the granting clause declares that there is " granted to said General Lafayette, and to his heirs, all such PARTS or PARCELS of the tract of land above described as are ' not legally claimed ' by any other person or persons whomsoever."

From the recitals in the patent, it might be inferred that General Lafayette's entry had the same boundaries as described in the patent; the fact, however, is, that the description contained in the patent is the first description, in words, of the land claimed under the entry; the patent being, in fact, founded on the figurative plan, which is attached to and forms an essential part of the patent, and to this plan we are forced to look for a certificate of the register, " stating that the land is not rightfully claimed by any other person."

Until the certificate was made, the secretary was not authorized to issue the patent, and, to enable the register to make the proper certificate, he was compelled to delay till congress, either directly or indirectly, through commissioners, ascertained the rightful claims of others lying within the limits supposed to be covered by General Lafayette's location; and as the location, in the form it was surveyed, (and no doubt as claimed to exist when it was made,) notoriously interfered with claims of different private individuals, and covered possessions protected by the act of March 3, 1807, no reason could be urged, on behalf of the locator, why a survey and certificate should be made and returned to the secretary of the treasury before the private claims were duly ascertained; it being the obvious object of the locator to obtain " the parts or parcels of land," within his out-bound-

aries, that should chance to be found vacant, after the private claims had been acted on and confirmed, or rejected.

As respected these private rights and pretensions, congress reserved to itself the power to deal with them by such means as were deemed appropriate; and by the course of action it prescribed, General Lafayette was compelled to abide. The case of West v. Cochran (17 How. 403,) lays down the governing rule on the subject.

The courts of justice have no power to revise what congress, or commissioners acting by its authority, have done in their confirmations of the titles here assailed. Against the United States these confirmations are conclusive, and they are equally so against General Lafayette; this being a condition imposed on his location by the act of 1805, above quoted, and which is affirmed in his patent. Titles, covering the lands sought to be recovered by the petitioners below, were confirmed to others before the patent to General Lafayette was issued, which appears by documents found in the record. But, if these documents were wanting, we are of opinion that the patent, and the figurative plan, with the designations on it, where the private confirmed titles and the vacant lands are laid down on the plot, and noted as private property or as vacant, furnish evidence that nothing passed by the grant but the lands noted as being vacant. It is, therefore, ordered that the judgment in the circuit court be affirmed in the respective cases cited in the caption.