MARY L. TYLER, Respondent, *v.* WILLIAM WELLS *et al.*, Appellants.

June 26, 1876.

There being an interference between two approved surveys made by the United States, one made in 1851, of a confirmation made by the old board of commissioners in 1810, and the other in 1817, of a confirmation made of a lot in the common field of St. Louis by the 2d section of the act of April 29, 1816, *held*, that the title under the survey, made in 1851, of the

-confirmation made in 1810 was the better, for two reasons: 1. Because the survey of 1851 had relation to the confirmation of 1810, and so was prior to the confirmation of 1816. 2. Because the express terms of the act creating the confirmation of 1816 excludes from its operation whatever had been previously confirmed by the board of commissioners.

.APPEAL from St. Louis Circuit Court.

*Affirmed.*

*Glover & Shepley,* for appellants.

*Britton A. Hill,* for respondent.

GANTT, P. J., delivered the opinion of the court.

This was an action of ejectment commenced in 1857. The plaintiff deduced title from a confirmation, in 1810, by the old board of commissioners, to Labeaume. The location of this confirmation was the subject of much controversy. A survey made in 1851 was approved in that year, and a patent was issued in accordance with it in 1852. Immediately on its issue, litigation, which had been commenced before, assumed a new shape as to the rights of the owners of the Brazeau reservation of four by four arpents. These owners claimed that this reservation lay within the survey for Labeaume.

The owners of the latter contended that the reservation lay to the south of Labeaume's survey. This contest was finally determined, 1873, by the decision of the Supreme Court of the United States. *Tyler* v. *Maguire*, 17 Wall. 253, and following. The survey approved in 1851 embraced much more land than had been included in any previous survey of this confirmation. This came to pass by reason of its being at last made to conform to the lines of the original survey made to Labeaume under the government of Spain. The grant made by the lieutenant-governor to Labeaume was declared, on its face, to contain 374 arpents of land, and it was for this area that Labeaume had filed his petition. It was surveyed for him by the *agrimensor* (surveyor) of that day, and the grant, with the survey, were laid before the board of commissioners as the foundation of Labeaume's

title to a confirmation. The board confirmed to him 356 arpents, and four arpents to Brazeau, and ordered the confirmation to Labeaume to be surveyed " agreeably to the concession from Zenon Trudeau to Labeaume, and, as respects the four arpents, agreeably to a reserve made in a sale from Joseph Brazeau to Louis Labeaume." Looking back to the concession made by Trudeau, we find it designated by the Spanish survey made April 10, 1799. It included both the land belonging to Labeaume and the reservation, not of four arpents, but of *four arpents square*, or sixteen arpents, reserved to himself by Brazeau when he made a sale to Labeaume, on May 9, 1798, of the residue of a grant of four by twenty arpents made to Brazeau on June 25, 1794.

It must be borne in mind that in the days of the Spanish government the order of events in obtaining a grant of land was, (1) a petition to the lieutenant-governor for a tract of land with a more or less definite description; (2) an order by the lieutenant-governor to the surveyor to put the petitioner in possession of the land claimed, if it were part of the royal domain; (3) a certificate made by the surveyor or *agrimensor* that the land asked for was unappropriated, with a figurative plat of it, very seldom with accurate or detailed field notes; (4) a reference of the whole matter to the governor-general, at that time residing in New Orleans; and (5) a complete grant by him to the petitioner.

In the immense majority of cases the complete grant from the governor-general was not obtained, and, what has always been familiarly known in Missouri as " a French or Spanish grant " was nothing more than this preliminary order of the lieutenant-governor to the surveyor, followed up, as it almost invariably was, by the surveyor's return, giving definiteness to the sometimes vague grant or permission to occupy in anticipation of the complete grant from the governor-general. This last officer had vice-regal pow-

ers, and a grant by him, before the change of government, was as effectual as a patent from the United States after that event. But the permission to occupy given by the lieutenant-governors, or military commandants of the various posts did not convey title to the petitioners. They contained, for the most part, a declaration that these preliminary measures were intended to facilitate the grant of a complete title by the governor-general. The instances in which a complete title was thus obtained were very few. Within the old limits of the town of St. Louis there was not a single case of such a title, perhaps not one within the present limits. North of the St. Louis common field was one such grant to Cerré (S. 2042), and west of what is still called " King's Highway " (Chemin du Roi, or El Camino del Rey) were two such grants to Charles Gratiot. There were a few others, but only a very few.

Almost without exception the figurative plat returned by the surveyor, and ascertainable on the ground by stones or other fixed monuments at the corners, contained a larger area than was prayed for by the petitioner. This was the case with the survey of Labeaume. It contained more than 374 arpents. If it had contained 374 arpents, and no more, there would still have been, after satisfying the reservation to Brazeau of sixteen arpents, 358 for Labeaume. As we have seen, the board confirmed to him 356 arpents only, speaking by quantity, but referred, for ascertainment of the land confirmed, to the concession and survey executed under the Spanish government, and at the same time declared (we interpret this document by the light of the decision of the Supreme Court of the United States above quoted) that Brazeau's reservation, part of this concession, was also confirmed to him, amounting to four arpents square, or sixteen arpents. The earlier surveys of this confirmation were mistakenly confined to 372 arpents (or 356 plus 16), and the western line of these earlier surveys was made parallel with the western line of the old Spanish survey.

[*a b c d e f a* is the tract embraced within the Spanish survey for Labeaume, made by Soulard in 1799, and resurveyed in 1851, to satisfy the confirmation of 1810. This is United States survey 3333. *a m n d e f a* is the tract embraced in one or more surveys of the same confirmation (surveys 982 and 2974), made before 1851, and disapproved by the land office. *b c n m b* is the parallelogram included

in the Spanish survey of 1799, and the approved United States survey of 1851, but excluded from surveys 982 and 2974. *a p q r a* is the tract of four arpents square surveyed as directed by the Supreme Court of the United States, *Maguire* v. *Tyler*, 8 Wall. *a r s t a* is the tract of four arpents square, as erroneously located by the direction of the secretary of the interior in 1851. Survey 1479 is the common field confirmed to Lirette by the act of April 29, 1816.]

This western line was oblique to the east and west lines of the St. Louis common field. The north and south lines of the Labeaume survey, being perpendicular to its western line, were also oblique to the north and south lines of the common-field lots. It is easy to construct a diagram indicating the old and new surveys of the Labeaume confirmation, and such a diagram is filed with, and made part of, this statement. It should be noted, however, that Labeaume's representatives always claimed that 356 arpents were to be laid off to them in a diagram without re-entrant angles, and that Brazeau's reservation was to be laid out directly to the south of, and adjoining to, the southeast corner of it, thus putting the reservation *outside of* the tract from which it was carved. The claimants under Brazeau contended that the two confirmations were to be surveyed, first, for the ascertainment of the whole tract, including the reservation to Brazeau and the extended grant to Labeaume, and that within this large tract, and at its southeast corner, the reservation of four by four arpents to Brazeau was to be laid off. This last view, which was the only one consistent with the calls of the various documents relating to this complicated subject, was finally affirmed by the Supreme Court of the United States, as before mentioned, in 1873 (17 Wall. 253). Indeed, the matter had been substantially settled some years before (8 Wall. 669). Several surveys, made in the attempt to conciliate the conflicting views of the contending parties, between 1810 and 1851, were successively made and set aside. In all these more attention was

paid to the designated area of the tract confirmed than to the corners of the old Spanish survey, and a parallelogram included between the north and south lines of that survey, its western line, and a line parallel with and some distance to the east of this western line, though within the Spanish concession, was by the earlier surveys left out of the survey of the confirmation of the claim by the United States. When, in 1851, the commissioner of the general land office, in obedience to the decision of the secretary of the interior, ordered the lines of the old Spanish survey for Labeaume to be retraced, and approved the survey thus made as the correct designation of the land confirmed to Labeaume, there was added to the tract this parallelogram, which invaded the common-field lot confirmed to the representatives of Lirette by the act of April 29, 1816, and for this interference the present suit was instituted.

The owners of the Lirette confirmation contended that, as the 1st subdivision of the 2d section of the act of April 29, 1816, operated a complete investiture in the confirmee of the title to the land confirmed by that act, and as, according to the letter of the decision in *West* v. *Cochran*, 17 How. 403, "until the survey was made the confirmee's title attached to no land" (p. 416), in the case of the confirmation to Labeaume, the confirmation to the legal representatives of Lirette was in fact the first appropriation of the land within the interference. As we have seen, the first approved survey of the Labeaume confirmation was made in 1851. The act of April 29, 1816, operated a complete investiture of title in the confirmee. There was much plausibility in the argument that the fee as to the interference passed by act of Congress to the representatives of Lirette, thirty-five years before the United States appropriated it to the satisfaction of the confirmation to Labeaume, and that the decisive answer to this pretension has not been made after the end of nineteen years is evidence that such an answer is not obvious. So far as any tribunal short of the Supreme Court of the United States

can make any such answer it has been made in this very case by the Supreme Court of Missouri (57 Mo. 472), which decides the title under the confirmation of 1810, surveyed in 1851 and perfected by patent in 1852, to be better than that which was perfected in 1816. By the decision cited, the first judgment rendered in this case in favor of the title under the act of 1816 was reversed, and the cause having been tried again by the Circuit Court in conformity with that opinion, and decided this time in favor of the plaintiff, comes before us on appeal with the ultimate design, as we learn, of taking the opinion of the Supreme Court of the United States.

We have a full assurance of the correctness of the conclusion reached by the Supreme Court of the State of Missouri on this subject. That conclusion is principally reposed on the well-known doctrine of relation, and this would in our judgment be enough to justify that conclusion. But, if we are not mistaken, there is another and more direct reason for it, and, as it has not, so far as we are aware, received judicial notice up to this time, we consider it proper to state it here.

In all the legislation of Congress looking to the confirmation of inchoate or imperfect rights or claims to land in the Territory of Louisiana, acquired from France by the treaty of 1803, scrupulous care was taken not to prejudice, by subsequent enactments, any right already existing. In the act of 1807, amendatory of the act of 1805, the first of the series on the subject, section 3, confirming the claim of the city of New Orleans to common, was careful to provide that nothing therein contained should " be construed to affect or impair the rights of any individual or individuals to the said common, which are derived from any grant of the French or Spanish government." This being the first act of Congress on the subject, the only reference to pre-existing rights was to such as originated under the government through which the United States claimed the territory. Under this act the confirmation to Labeaume was made.

The next legislation on this subject was the act of June 13,. 1812. The 1st section *ipso facto* confirmed to the rightful claimants thereof " all town or village lots, out-lots, common-field lots, and commons in, adjoining, or belonging to " certain towns and villages in Missouri, of which St. Louis was one, which had been " inhabited, cultivated, or possessed prior to December 20, 1803 ;" " provided, that nothing. herein contained shall be construed to affect the rights of any persons claiming the same land, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in the said territory." The language used here varies, but only very slightly, and not to the change of the sense, from that used in the act of 1807. There the words " affect or impair " were used ; here the word is " affect " only. Some remarks occur later in this opinion on this head. At present we pursue the examination of the statutes, the next of which in order is the act of April 12, 1814. Here, after declaring under what conditions a confirmation shall be given, there comes a proviso that " no confirmation made by this section shall affect the rights of any person claiming the same land,. or any part thereof, whose claim has been confirmed by a board of commissioners for ascertaining and adjusting claims to land in said State or Territory, nor preclude a judicial decision between private parties in such interfering claims."

The next act is that of April 29, 1816. This act, in express terms, provides for the confirmation of a certain class of claims, under the terms and conditions prescribed by the act of June 13, 1812. The words used by the lawmakers are, in respect of all claims embraced in the reports of the recorder dated November 1, 1815, and February 2, 1816, that the claims, " where the decision of the commissioner is in favor of the claimants, shall be, and the same are hereby, confirmed, to wit, *confirmations of village claims under the act of Congress of the thirteenth day of June, 1812*," *        * etc. (sec. 2 of the act of April 29, 1816). It is scarcely necessary to note here that the

recorder of land titles at Missouri was commissioned by the act of June 13, 1812 (secs. 4 and 8), to make the inquiry the result of which these reports embodied, and in section 2, of the act of April 29, 1816, just quoted, in the same sentence, he is called by both names.

It is unnecessary to pursue the examination further, though it would be easy to show that, in every act subsequently passed by Congress, down to July 4, 1836, the same careful protection is thrown around the person who could claim the benefit of a prior act. This is demonstrably true, even of the act of May 26, 1824, where this protection is apparently omitted; but time would be taken up in illustrating this position, and in the case at bar we are only concerned with the operation of the acts of March 3, 1807, and April 29, 1816. Now, it is familiar to the bar of St. Louis that the reports of the recorder, referred to in section 2 of the act of April 29, 1816, in every instance of a recommendation of a claim to a " town or village lot, out-lot, or common-field lot," for confirmation, assigned as a reason therefor that it had been ascertained by the recorder to have been inhabited, cultivated, or possessed prior to December 20, 1803. The confirmation by the first section of the act of June 13, 1812, proceeded upon these facts existing in the past, and the further fact of a present existing claim in accordance with such possession, inhabitation, or cultivation. When, therefore, Congress, in 1816, declared the recommendations of the recorder in respect of " village claims," to be confirmed under the act of Congress of June 13, 1812, it established two things: First, that in respect of these claims the United States, which was the proprietor of the land, accepted the recorder's report as authentic, enduring, and conclusive evidence of the possession, inhabitation, or cultivation prior to December 20, 1803, of the land which was the subject of the village claim; and, second, of the right of a subsisting claimant thereto, who was either the first proprietor of the claim or some one representing him. The legal consequences of the establishment of these facts

were declared also. The claimant was confirmed in his rights, and the persons whose claims were thus enumerated in the reports of the recorder enjoyed a marked advantage by reason of this authentic preservation and perpetuation of the evidence of this possession, inhabitation, and cultivation, etc., over those who were, for want of such support, compelled to resort, whenever their title was challenged, to the testimony of living witnesses, numerous in 1812, but of whom few indeed now survive to establish the fact of such possession, etc. But the confirmees under the act of 1816 were, in terms, confirmees under the act of 1812. The facts alluded to being established to the satisfaction of the proprietor of the whole territory, they received from the bounty of Congress such relief as was given by the act of June 13, 1812—that is, their claims were *ipso facto* confirmed, subject to the condition and qualifications stated in that act, the chief one of which was that the confirmee should take nothing by this confirmation *as against any other person whose claim to the same land had been confirmed by the board of commissioners, etc.* Now, Livette was confirmed as one of a class. The necessary, irresistible qualification of his confirmation was that his "village claim was confirmed so far as, and no further than, it lay outside of, and did not affect, the claim of Labeaume, or any other person confirmed by the board of commissioners, etc. His confirmation carried on its face its own limitation, and could never be set up against that of Labeaume, and, whatever may be thought of the possible validity of an unqualified grant by Congress, in 1816, of land within the bounds of a survey filed to identify and ascertain the land confirmed to some one else in 1810, but not conclusively adopted and ratified by the United States until 1851, no such validity can be claimed for a grant which expressly and industriously excepts from its operation all land which is within that survey.

It is of course unnecessary to dwell upon the meaning of the phrase "village claims." Its significance is indicated

by the context in the section where it occurs. The claims intended are such as are confirmed by the act of June 13, 1872, and by reference to that act we see that these are claims for "town or village lots, out-lots, common-field lots, and commons." We also know, historically, that the French or Spanish town or village embraced all these particulars—that all these were considered part of the French or Spanish village or town.

Before closing our remarks we are led, through the warning conveyed by the obstinate litigation into which parties have been led by an unguarded expression, to state what seems to us a necessary qualification of the rule we have laid down. If we thus protract this opinion to what seems an undue length, and exhibit a degree of caution which may be considered excessive, the fault is less serious than if we mislead the bar by stating, without qualification, a proposition, the limitations of which are, we think, not only important, but essential. A similar degree of caution in framing the rule found in 17 How. ( *West* v. *Cochran*), might have prevented a wasting litigation, and its attendant loss of time and money.

The qualification we desire to note is that, while the several acts of Congress carefully guard any prior confirmee, not within the purview of the later act, from being affected by that later act, this, and no more, is the aim and object of the proviso. Congress, in the proviso to the act of 1812, seeks to protect—whom? Any person claiming the same land under the provisions of a former act, who is not within the beneficial operation of the later act. It would clearly be senseless and contradictory to refuse to A the benefit of a confirmation by the act of 1812, because he had already procured in his favor a report or decision of the board of commissioners, etc., for the same land. Such a decision, as we know, would not create a complete title ( *Burgess* v. *Gray*, 16 How. 48) even if surveyed. Until surveyed, the claim confirmed would have no locality, and the confirmee no legal standing in court. *West* v. *Cochran*, 17 How. 412.

But a confirmation by the act of 1812 conveyed a complete title without more. *Saxignac* v. *Garrison*, 18 How. 136; *Guitard* v. *Stoddard*, 16 How. 494. It would obviously be advantageous to A if, having a claim on which the board of commissioners had acted favorably, he should be confirmed in his claim to the same land by the act of June 13, 1812. Such operation of the act of 1812 would not, and could not, contravene the policy of Congress indicated in the proviso, but would directly promote it. Is there anything in the language employed which nevertheless leads to the conclusion that, perhaps without intending it, Congress withdrew all such cases from the operation of the act of 1812? If so, of course a court does not possess the power of correcting a legislative inadvertence.; but we are of opinion that the contrary intention is clearly manifested.

We have seen that in the act of 1807 the words used are "affect or impair the rights," etc. This is what Congress was careful to avoid doing, and clearly nothing was forbidden by this act that did not tend to "affect or impair the rights," etc., of any prior claimant. If the necessary or accidental operation of the section to which this proviso was annexed were to *validate and strengthen* the rights of a prior claimant, no one, we think, would dream that such operation was hindered by the proviso.

But the signification of the word employed in the proviso of the act of 1812 is, we think, the same with that we have just considered. Undoubtedly a party may be beneficially affected, as well as injuriously affected, by anything, and the word *affect*, standing alone, may be said to be equivocal. But, besides that, all these acts (that of 1807, that of 1812, that of 1814, and that of 1816), being *in pari materia* (in fact, we should not overstate it if we said *in eadem materiá*), are to be construed together, and the same words occurring in each are to receive the same interpretation throughout. *Ailesbury* v. *Pattison*, Doug. 30; *Rex* v. *Loxdale*, 1 Burr. 445 (Lord Mansfield's decisions); *State* v. *Springfield Township*, 6 Ind. 83; *Board of Commissioners* v. *Cutler*,

6 Ind. 354 ; *McCartee* v. *Orphan Asylum Society*, 9 Cow. 437. We see that such is, indeed, the conclusion to which we are compelled, in an instance where " affect " is found alone and unqualified ; that we are forced to read it in the sense of " affect injuriously ;" and that the intention of the law-makers was to guard the former confirmee, being a different person from the later confirmee, from a title that might otherwise be acquired by the later and different person to the *same* land.

We refer, for the purpose of this argument, to the second proviso to the first section of the act of April 12, 1814 : " Provided, also, that no confirmation made by this section shall affect the rights of any person claiming the same lands, or any part thereof, whose claim has been confirmed by a board of commissioners for ascertaining and adjusting claims to land in said State or Territory, nor *preclude a judicial decision between private claimants in such interfering claims.*" Here only the word " affect " is used in the first clause of this second proviso ; but its meaning is clearly the same as " impair," or " affect injuriously," for in the second clause it is declared that it is directed against " *such interfering claims* " as might otherwise, by possibility, prejudice the claim of the prior confirmee. The claim provided against is *ex vi termini* an " *interfering claim ;*" that is, in order to come within the prohibition of the proviso, the person who, but for the proviso, might claim a confirmation under the later act, must be a different person to whom it would otherwise confirm an " interfering claim." This is the view of the matter which we understand the Supreme Court of the United States to take in the case of *Strother* v. *Lucas*, 12 Pet. 410 (p. 454, for the passage referred to), and we consider it unnecessary to say more.

All the judges concurring, the judgment of the Circuit Court is affirmed.

[NOTE.—This decision was rendered in May, 1876. At the October term, 1876, of the United States Supreme Court, a decision *(Ryan* et al. v. *Carter*, 3 Otto, 78), was rendered, sustaining the qualification made at p. 537 *et seq.*