## CARONDELET *vs.* SAINT LOUIS.

1. Where suit is brought in a State court by a town claiming part of its common under the act of Congress passed in 1812, and the defence is that there was a survey in pursuance of the federal statute which estops the plaintiff to set up his claim, this court has jurisdiction to re-examine the case, and reverse or affirm the judgment.

2. The true construction of the act of 1812 is, that it granted to the inhabitants of the towns and villages therein named, (and to Carondelet among others,) their lands used in common for pasturage, but reserved the authority to define the limits of those common lands by a survey.

3. A survey made by a Spanish officer under instructions from the Spanish Lieutenant Governor, previous to 1800, which proceeded no further than the running and marking of the northern line of the common, and did not ascertain the southern or western lines, amounted to nothing.

4. Until a survey was made on the west and south the villagers had no title on which they could sue, because their grant attached to no land, nor could a court of equity establish a boundary.

5. If no legal or binding survey was made of the Carondelet common after the act of 1812, then the title remains to this day what it was at the passage of the act, a vague claim for six thousand acres, without boundaries and incapable of being judicially maintained.

6. But if a survey of all the lines was made in 1817 by a deputy surveyor of the United States, under instructions from the Surveyor General, which was traced and remarked by another deputy in 1834, this was a binding survey, though it did not follow the northern line made by the Spanish officer.

7 It being established in the court below as matter of fact that such survey was made and approved in 1817 and 1834, and that the corporation of Carondelet had in various modes recogni᷉ᵉd, accepted, and held under it, the State court was right in rejecting the claim of the town for lands lying outside of it.

Writ of error to the Supreme Court of Missouri.

This proceeding was commenced by the city of Carondelet against the city of Saint Louis in the Saint Louis Land Court

by a petition, in which the plaintiff (Carondelet) set forth that it was a Spanish town for more than thirty years prior to December 20, 1803, (the date when that country was ceded to the United States,) and the inhabitants of the town for several years before and after 1803 used and possessed a certain tract of land adjoining the town as commons; that between the years 1796 and 1800 the northern line of the Carondelet common was surveyed and marked by Don Antonio Soulard, the Spanish surveyor for the province of Upper Louisiana, pursuant to an order of the Governor, which was published at the church door of Saint Louis; that this line commenced on the bluff bank of the Mississippi at the Sugar Loaf Mound, four miles south of St. Louis, and two miles north of Carondelet, and running thence westwardly; that the line was distinctly marked; that the land south of it continued to be used as commons by the inhabitants of Carondelet until December 20, 1803, and was claimed by them as such until June 13, 1812, on which day it was confirmed to them as their absolute property by an act of Congress. The petition complains that Saint Louis, in fraud of the rights of Carondelet, procured in 1831 a survey to be made of the common lands of the former city, whose southern line is nearly a mile south of the Sugar Loaf Mound, whereas it should have followed the line established by the survey of Soulard, and the respective possessions of the parties in Spanish times. The petition further avers that Saint Louis is in the actual possession of the land covered by the two surveys, and prays judgment that the survey of 1831, so far as it interferes with the claim of Carondelet, be set aside, and the plaintiff be put in possession.

A verdict and judgment were rendered in the Land Court in favor of the defendant, and the cause was removed by writ of error to the Supreme Court of Missouri, where it was reversed and the record remitted, with an order for a *venire facias de novo*. On the second trial the verdict and judgment were again in favor of the defendant, and another writ of error was taken to the Supreme Court of the State, where the judgment was affirmed. A very full report of the case as it stood in the State court will be found in 29 Missouri Rep., 527.

The act of Congress of June 13, 1812, confirmed to the inhabitants of certain towns and villages (among others Saint Louis and Carondelet) "the rights, titles, and claims to town or village lots, out-lots, common-field lots, and commons in, adjoining or belonging" to them, which were "inhabited, cultivated, or possessed" prior to December 20, 1803, "according to their several right or rights in common thereto." The same act made it the duty of an officer to run an out-boundary line so as to include the commons of each village. In 1816 Congress provided for a survey of all claims confirmed by previous acts. Another act, similar in its tenor and object, is dated in 1824, and in 1831 the United States relinquished all their interest in these common lands to the inhabitants of the respective towns and villages, to be held by them in full property and for their own use, according to the laws of Missouri.

Saint Louis was incorporated in 1809, and Carondelet in 1832, both by the County Court. The limits of Saint Louis were described as extending southward to Sugar Loaf Mound. The bounds given to Carondelet extended 2,640 yards on the Mississippi, and west to Fourth street, but did not include the north common, or the fields, or the south commons.

In 1816, or 1817, a survey was made by Elias Rector, a deputy surveyor, under instructions from his superior, apparently in pursuance of the law passed in 1816. In 1834 Joseph C. Brown, another deputy, under similar instructions, retraced and marked the survey of Rector. Brown's work was approved by the Surveyor General. His survey ascertained and marked all the lines of the common land appurtenant to Carondelet, and found its contents to be 9,905 acres, or about 11,642 arpents. The authorities of Carondelet were present at the making of this survey by agents specially appointed for that purpose. They procured a copy of it and directed it to be framed for the benefit of the town. In 1839 they ordered all the commons north of the River des Peres to be leased. The lots on the extreme north were made fractional by Brown's line, and they were leased as fractions. A plot of these subdivisions, filed by themselves in the recorder's office, calls for the Saint Louis common on the north. In several suits be-

tween the town and other parties, Carondelet gave Brown's survey in evidence as the basis of her title. When an attempt was made in the War Department of the United States to annul the survey, Carondelet protested and petitioned Congress to confirm their right according to the survey. The city of Saint Louis in the mean time (1836) proceeded to subdivide her common lands into lots down to the line of Brown's survey and sold them, but not without a formal notice from a committee appointed by Carondelet that the lands were claimed by the latter corporation. This suit was brought in 1855.

The Supreme Court of Missouri held that the evidence given in the Land Court proved the acceptance of Brown's survey by the authorities of Carondelet; that it could not be accepted in part and rejected in part, and that such acceptance estopped Carondelet from claiming any land outside of the survey.

*Mr. Hill*, of Missouri, for plaintiff in error. The case involves the construction of the act of Congress of 1812, under which Carondelet claims. This act gives the land specifically and unconditionally to the inhabitants of Carondelet. Their title was perfect without a survey, and therefore it could not be divested by the survey of 1834. *Bird* vs. *Montgomery*, (6 Mo., 511;) *Chouteau* vs. *Eckhart*, (2 How., 421;) *Guitard* vs. *Stoddard*, (16 How., 494;) *West* vs. *Cochran*, (17 How., 416;) *Carondelet* vs. *McPherson*, (20 Mo., 192;) *Carondelet* vs. *St. Louis*, (25 Mo., 448;) *Milburn* vs. *Hortez*, (23 Mo., 532;) *Staniford* vs. *Taylor*, (18 Howard.) The out-boundary survey directed by the act of 1812 has been held by the Supreme Court of Missouri not to be conclusive against the claimant of a common-field lot outside of such survey. *Gurno* vs. *Janis*, (6 Mo., 330;) *Page* vs. *Scheibel*, (11 Mo., 167;) *Schultz* vs. *Lindell*, (24 Mo., 567.)

Whether Brown's survey was a survey of all the land confirmed to the inhabitants of Carondelet was a question of fact, but the State court decided it as matter of law, and defeated the act of Congress by giving to the survey an effect which it was not entitled to have. Moreover, Brown's survey was illega_ and fraudulent, because it was not made under in-

structions from the Commissioner of the General Land Office, as the act of 1824 requires. Besides, the survey of 1821 did include the land in dispute; there was never any appeal from it; it was duly made, and is conclusively binding on the United States. *Minard's Heirs* vs. *Massey*, (8 How., 294,) which is relied on as sustaining the view of the State court as to the effect of the acceptance of the survey of 1834, has no application to this case.

The Spanish law was in force in Upper Louisiana when this right originated, and continued in force until 1816. By that law the commons could not be alienated without the consent of Congress. 5 Partidas Law, 5, tit. 5. And the same rule prevails under the common law. *Cincinnati* vs. *White's Lessee*, (6 Peters, 432.) The express authority, therefore, of the Missouri legislature was necessary to enable the trustees of the inhabitants of Carondelet to divest their title by accepting a survey.

*Mr. Shepley* and *Mr. Gardenhire*, of Missouri, for defendant in error. This court has no jurisdiction to revise the judgment of the State court in a case like the present. The validity of no treaty statute or authority, exercised under the United States, is drawn in question. Certainly there is no decision against the right asserted under the United States. The plaintiff claims title to certain lands by virtue of an act of Congress. The court. says: "True, the land *was* yours; your title under the law is not to be denied; but you are estopped to show that title against this party, because you have done acts which make its assertion inconsistent with equity and good conscience." This is no more deciding against the right claimed under the statute than it would be to hold that the plaintiff's title was divested by a sale or barred by the statute of limitations. *Montgomery* vs. *Herndez*, (12 Wh., 129;) *Matthew* vs. *Zane*, (7 Wh., 164;) *Harris* vs. *Denny*, (3 Pet., 292;) *Crowell* vs. *Randall*, (10 Pet., 391;) *Nelson* vs. *Lagow*, (12 How., 98;) *Moreland* vs. *Page*, (20 How., 522.) These cases show that this court will not and ought not to revise the judgment of a State court on any but the questions of federal

jurisdiction enumerated in the 25th section of the act of 1789.

The town of Carondelet had no title to the land in dispute by the act of 1812 without the survey, which the same act, as well as subsequent acts, authorized and required. Pasturing cattle or cutting wood were acts which the villagers might do upon lands not appurtenant to the town as commons. A survey was necessary, otherwise it must be supposed that Congress gave to the towns an absolute title to lands, the limits of which might be defined at any future time by parol evidence of the extent to which cattle grazed and men cut wood. Unless the right of Carondelet was defined by the survey, it is not defined at all, and the grant is void for uncertainty. The contradictory and uncertain testimony of the witnesses shows the value of this principle and the necessity of adhering to it.

But here was a survey not only unappealed from, but accepted by many acts of the party who now attempt to repudiate it. The binding effect of a survey of commons under the acts of 1812, 1824, and 1831, upon a party by whom it is accepted, has been established by many decisions of this court. *Chouteau* vs. *Eckhart*, (2 How., 344;) *Le Bois* vs. *Brammell*, (4 How., 456;) *Minard* vs. *Massey*, (8 How., 301;) *Guitard* vs. *Stoddard*, (16 How., 494;) *Willet* vs. *Sandford*, (19 How., 82;) and other cases. It is undoubtedly true, as decided in *Guitard* vs. *Stoddard*, that an individual may recover a common-field lot without a survey; but if he asks for a survey under the act of 1812, has it made by proper authority, assents to it, and accepts it, can he afterwards claim beyond it?

What is alleged to have been a survey of this common in 1821 was not a survey. But Rector's, in 1817, has all the marks of an authentic and approved survey that can be found on any survey of that time. Brown's, made in 1834, was regularly approved by the surveyor general; was adopted by the United States; was accepted by Carondelet, and the parties are mutually estopped to deny its legal validity.

The objection of the plaintiff in error that the court decided the facts connected with the survey as matters of law is not

Carondelet vs. St. Louis.

well founded. The jury found the facts, and the court applied the law by saying that the facts created an estoppel.

The survey having been made and accepted, it is a survey of the whole claim, conclusive and binding as a whole. The reasoning of the State court in this case and in that of *Carondelet* vs. *McPherson*, (20 Mo., 192,) exhausts the subject, and shows clearly how inequitable any other principle would be.

*Mr. Ewing*, of Ohio, in reply. The denial of jurisdiction in this court rests on no solid foundation. The whole case, in all its points, is made up of the construction of laws of the United States, and acts of Federal officers and of other parties having reference thereto. The Supreme Court of Missouri says in express terms that the case must be governed by the acts of Congress and the laws of Missouri. Both parties assert title under the same acts of Congress, and the actual title depends on the construction of those acts. This gives jurisdiction. *Matthews* vs. *Lane*, (4 Cr., 382;) *Ross* vs. *Doe*, (1 Pet., 664;) *Buel* vs. *Van Ness*, (8 Wh., 324;) *Lytle* vs. *Arkansas*, (22 How., 202.) In *Mackay* vs. *Dillon*, (2 How., 372,) this court reversed a judgment of the State court because it gave to a survey properly admitted an effect to which it was not entitled.

On the passage of the act of June 13, 1812, the title of Carondelet was perfect to all the land which she possessed prior to 1803 by well defined and undisputed boundaries, and that title was not defeasible by any subsequent survey of a Federal officer. *Mackay* vs. *Dillon*, (4 How., 446;) *Guitard* vs. *Stoddard*, (16 How., 508.)

But if a survey be necesary to make valid, or if it be effectual to destroy the title under the act of 1812, then the survey of Brown in 1821 is invoked in favor of Carondelet. Until that survey was set aside there could be none after it.

If titles resting on a survey are once defined thereby, such survey cannot, after a long time, be *disregarded* by the United States, and a new survey made, without considering it or setting it aside, and thus shake or destroy the titles which it had

defined. If this process of demolition could be begun at the end of fourteen years, and consummated at the end of thirty-five years, there is nothing to protect title thus acquired, and a cloud may hang over it forever; the process may be repeated without limit as to number or time.

But the court below held Carondelet *estopped*, under their construction of the laws of the United States, from asserting title to the land in controversy. This point assumes the *title* in Carondelet, and asserts that good faith or some rule of law forbids her to set it up. As between Carondelet and St. Louis the court below did not find an *estoppel*, except through the United States, by virtue of the survey of Brown in 1834, and the acts of Carondelet under it. Indeed, it was impossible that they should so find, for Carondelet resisted from first to last the seizure of her property as fully and efficiently as she was able to resist. And it is difficult to perceive a moment of time when the United States offered and Carondelet accepted the survey of 1834. It was not an approved survey until March, 1855—a month after this suit was brought. To say that Carondelet was *estopped* by the action of the Secretary of the Interior, on the matter then *sub judice* in our courts of law, is absurd. Carondelet, at the moment this *action* which is to *estop* her took place, was prosecuting her title before a court of justice, and she has not for a moment ceased or delayed its prosecution in consequence of the *action* of the Secretary of the Interior, but has continued, and still continues, to resist and repel it. If the United States has forever power over these titles, to enlarge, diminish, destroy, or transfer them, without the consent of the grantee, be it so. It is, in effect, so decided in this case by the court below; but let it not be called by a false name. It is the mere exercise of power, not *estoppel;* and such is the decision in deed, though not in name. It arises out of "the statutes relating to this subject," and not out of any principle of the common or civil law. The error of the court below is in making the survey of 1834 bar the title of Carondelet to lands within her well-defined boundaries, defined by lines and corner-stones, by fences, and by regular survey in 1821. *Jourdan* vs. *Barralt,* (4 How., 179.) No matter *how* the

court held the title barred by the survey of 1834, whether by direct annulment or by the expedient of an estoppel, it is that survey which is to destroy the title, and it was irregular and illegal. .

Mr. Justice CATRON. This cause is brought here by writ of error to the final decision of the Supreme Court of Missouri. The proceeding in the court below was according to the State practice, being by petition partly in the nature of a common law action, and also corresponding in other parts to a bill in equity. One issue was presented by the pleadings which was submitted to a jury. The petition states, that, between the years 1796 and 1800, the northern line of the Carondelet common was surveyed and marked by Soulard, the proper Spanish surveyor for Upper Louisiana, pursuant to an order made by the Lieutenant Governor of the province; that the line was run and duly marked in presence of certain of the inhabitants of St. Louis and Carondelet, and published at the church door. It commenced at the bluff bank of the Mississippi river, at a mound called the Sugar Loaf, about four miles south of St. Louis, and two miles north of Carondelet, and run westwardly to the northeast corner of the common-fields of Carondelet; that monuments were established at each end of the line, and a temporary fence was made of brush-wood along the same; and that the inhabitants of Carondelet held and occupied as their northern boundary of the common up to said line, from 1796 until December 20th, 1803, and continued to claim to said line to the time of passing the act of June 13, 1812, by which act it is averred the petitioners took an absolute and fee simple title to the land bounded on the north by Soulard's line. This is the legal title set up, and a recovery of possession is claimed to that line.

The equity asked to be enforced against St. Louis is, that, in 1831, the Surveyor General of Missouri and Illinois caused a survey to be made of the supposed commons of St. Louis, locating the southern boundary of the St. Louis common about one mile south of the Sugar Loaf, and of Soulard's line above described; that, to this line St. Louis claims title and holds

possession as part of its common, and which survey is declared to be in fraud of the rights of the inhabitants of Carondelet, and throws a cloud over their title as confirmed by the act of 1812, and they pray to have it set aside and held for naught, because it was made by the Surveyor General without any warrant or authority of law. Defence was made under the general issse.

A question has been raised whether this court has jurisdiction to re-examine the decision of the Supreme Court of Missouri.

The 25th section of the judiciary act provides, that where there is drawn in question the construction of any statute of the United States, and the decision is against the title set up and claimed under the statute, the case may be re-examined in this court, and the decision reversed or affirmed.

Here, title was set up and claimed by Carondelet to a part of its common, according to a true construction of the act of 1812. The claim depends solely on this act of Congress, taken in connection with Soulard's survey; and the decision being adverse to the claim, jurisdiction exists.

Soulard run a single short line from the mound to the east side of the common-fields, and did nothing further. He may have obtruded on the claim of common appertaining to St. Louis, and so the department of public lands must have adjudged, as a different line was adopted. At that early day the land was of too little value to attract attention to this proceeding.

The act of 1812 granted to the inhabitants at the place known as Carondelet their lands used in common, for the pasturage. But the power was reserved by Congress to the Executive authority to survey this common property, by including it in an out-boundary survey, reserving from the common property such portion as the Government saw proper to withhold for military purposes, which was done.

A tract of some nine thousand acres was claimed by this hamlet of people lying south of the village, as commune property, with a comparatively small exception. The southern portion was wholly undefined; it was in the condition of Cere's

claim, investigated by this court in the case of *Minard's Heirs* vs. *Massey*.

Had the out-boundary line been run according to the reserved power in the act of 1812, the boundary of the common would have been established, there being no other claims to be included. Until a survey was made on the west and south, the villagers had no title to the common on which they could sue, because their grant attached to no land, nor could a court of equity establish a boundary. This court so held in the case of *West* vs. *Cochran*, (17 How., 416.) The case is different, under the act of 1812, as to town lots and out-lots, as there stated. Such lots, and the possession of them, could be shown and identified, as matter of evidence. Ib., p. 416. The proposition is, of necessity, true, as respects all grants of specific tracts of land. If there be no boundary, the grant is vague, and cannot be identified, and the grantee takes nothing. The survey here was the completion of the title, although it succeeded the act of granting the land. It defined the grant.

In opposition to this doctrine, it is insisted that, by the act of 1812, a title in fee was taken, and that no public survey was necessary to give title. Such is the established doctrine of this court, as will be seen by the case of *Chouteau* vs. *Eckhart*, and *Bissell* vs. *Penrose*.

The first of these cases involved the St. Charles common; it had been officially and carefully surveyed, and the boundaries marked by Soulard, the Spanish surveyor. 2 How., 350. No question of boundary was involved in the controversy; and in the case of *Bissell* vs. *Penrose*, (8 How.,) there had been a private survey, which was filed with the board of commissioners, as descriptive of the land claimed, and which was held to have been reserved from location by a New Madrid certificate. It is, however, conceded, in the opinion of the court and in Mr. Justice *McLean's* dissenting opinion, that if no marked boundary had existed, the confirmation would have been vague, and the opposing entry valid.

This being the condition of the Carondelet common south of the village, a survey and line-marks entered into the title, and were necessary to *create* one; as to the survey, the land

granted must attach.   To this end, Elias Rector, a deputy sur-
veyor, in 1816 or 1817, under instructions from the Surveyor
General at St. Louis, made a survey of the Carondelet common,
fixing the upper corner at the west bank of the Mississippi
river, about a mile below and south of the Sugar Loaf Mound;
thence running westwardly to the common-fields, southwardly
with them so far as they extended; and then completed his
survey below the village and fields.   On the west and south
the lines adjoined public lands, and on the east the tract was
bounded by the Mississippi river.   It has many lines and cor-
ners.   The public lands and private claims lying north, west,
and south of Rector's survey had to be connected with it, for
the purpose of ascertaining the fractions in the townships lying
adjoining; and for this purpose, the Surveyor General, in 1834,
ordered Joseph C. Brown, a deputy, to trace and remark the
lines of Rector's survey, and connect them with the public
lands and private claims.   This was carefully done; the line
marks of Rector's survey were found, and it was remarked.
Under Rector's survey, thus identified by Brown's resurvey, Ca-
rondelet has claimed title, and now holds in fee a very large
portion of its common lands.   Its contestation has been as vig-
orous to uphold Rector's survey on the south as it has been to
overthrow it on the north.   It must be admitted, that if, when
Rector was sent into the field to survey the village common,
he had reported to the Surveyor General that, after beginning
at a certain point on the river, he had run a mile west, and
made a second corner at the fields, and there broke his com-
pass, and did nothing more, that such a survey and return
would have amounted to nothing.   And this is all that Soulard
did, acting under similar general instructions from the Spanish
Lieutenant Governor with those given to Rector by the Sur-
veyor General.   Both were directed to survey the common, and
make due return of their work.   No instructions were given
where either should begin, or how he should proceed after-
wards.   The correctness of the survey was to be ascertained,
and the work approved by higher authority.

It is objected that the field-notes of Rector's survey were
not platted or recorded, and were found in an obscure box in

the Surveyor General's office, and that, in fact, there never was an approved survey. Wm. Milburn, who was a clerk in the office as early as 1817, and had been Surveyor General, proves this objection to be groundless. But suppose it was true; then how does the title of the plaintiffs stand? Soulard never made a survey that any authority did or could recognise, as one of the common; if Rector's be a fiction, and Brown's remarking equally void with the survey he traced, then the Carondelet common has no boundary on the north, west, or south, and stands as the village title did when the act of 1812 was passed, which was a vague claim set up by the villagers for 6,000 acres before the board of commissioners; and to which quantity Mr. Secretary Steuart ordered them to be held, but gave no directions how the land should be laid off; and the matter having been brought to the consideration of Secretary McClelland, he adjudged, and properly, that Rector's survey and Brown's remarking of it concluded the Government, and bound the corporation of Carondelet to the whole extent of the survey.

This proceeding having the features of a suit in equity, and also of an action at law to ascertain the better title in one action, and the defendant having relied on the general issue to sustain the defence, offered Rector's survey in evidence, to prove the bounds of the land granted by the act of 1812. It was established as matter of fact, that the survey had been made, and the field-notes duly returned, and that Brown remarked the lines 1834. It also appeared, as matter of fact and of law, from the records of the General Land Office, by the decisions of the officers there, that the department administering the public lands had settled the question in regard to the regularity of Rector's survey, its due return, and approval. And the jury having found that the corporation of Carondelet had, in various modes, recognised, accepted, and held under Rector's survey, as identified by Brown in 1834, we are of opinion that the State court properly rejected the claim set up by the petition, and order the judgment below to be affirmed.

*Judgment of the Supreme Court of Missouri affirmed.*