JOHN COLEMAN ET AL., Appellants, *v.* JOHN W. ALLEN ET AL., Respondents.

January 22, 1878.

1. A. settled upon land, but was refused permission to enter the same. His right of entry being judicially determined in his favor after his death, his heirs consummated the preëmption right, entered the land, and a patent was issued to them in 1866, whereupon they conveyed to B. ; but they had previously, in 1862, conveyed to C. *Held*, that the conveyance executed prior to the entry and patent was valid as against that made subsequent thereto.

2. A preëmption claim on lands not declared public, although contingent,

is a fixed fact, awaiting such action of the government as will ripen the conditional into a positive right; and the preëmptor, though he acquires no right against the government, is protected from intrusion by others, and his interest in the land is assignable.

3. The act of Congress of Sept. 4, 1841 (U. S. Stat. 456, sec. 12), which declares all assignments of the rights thereby secured null and void, does not refer to the possession or the right of possession to the title or to the land itself, but simply to the right to be preferred over all others as a purchaser from the government at an established price, and the limitation upon alienation in that act has no application to the rights secured to the heirs of a deceased settler under the act of March 3, 1843.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

HILL & COLLINS, for appellants: The claim and possession of Carondelet, by force of the act of June 13, 1812 (2 U. S. Stat. 748), vested in it the fee to the land in controversy. — *Bird* v. *Montgomery*, 6 Mo. 511; *Chouteau* v. *Eckhardt*, 2 How. 421; *Guitard* v. *Stoddard*, 16 How. 494; *West* v. *Cochran*, 17 How. 413.    Carondelet was not deprived of her title by reason of the fact that the land was not within the survey. — *Page* v. *Scheibel*, 11 Mo. 167; *Milburn* v. *Hortez*, 23 Mo. 532; *s. c.*, 1 Black, 595 (in point); *Kissell* v. *Schools*, 18 How. 25; *Guitard* v. *Stoddard*, 16 How. 494.    No right could attach to the land until after the decision of *Carondelet* v. *St. Louis*, in 1862, it not being subject to preëmption until after that date. — *Shepley* v. *Cowan*, 1 Otto, 330.    The deeds to the respondents were merely quitclaims, and did not pass the after-acquired title. — *Gibson* v. *Chouteau*, 39 Mo. 536; *Bogy* v. *Shoab*, 13 Mo. 365.    Under the act of 1841, a sale made prior to the issuance of the patent is void. — *Arbour* v. *Nettles*, 12 La. An. 217; *Power* v. *White*, 2 La. An. 934; *Penn* v. *Ott*, 12 La. An. 233; *Stanbrough* v. *Wilson*, 13 La. An. 494; *Stevens* v. *Hays*, 1 Ind. 247; *McElrea* v. *Hayter*, 2 Port. 148; *Cundiff* v. *Orrus*, 7 Port. 58; *Glenn* v. *Thistle*, 23 Miss. 42; *Wilkerson* v. *Mayfield*, 27 Miss. 542; *McTyer* v. *McDowell*, 36 Ala. 39; *Pauldiny* v. *Grimsby*, 10 Mo. 210; *Myers* v. *Croft*, 13 Wall. 291.

EDWARD BRANCH COWAN, for J. W. Allen: A preëmptor has an inchoate title, good against all except the government, from the date of the initiatory steps prescribed by law. — *Frisbie* v. *Whitney*, 9 Wall. 187; *Haywood* v. *Ormsby*, 11 Wis. 3. And this right or title he may assign before entry. — *Landes* v. *Perkins*, 12 Mo. 259; *Garnier* v. *Barry*, 28 Mo. 446, 447; *Landes* v. *Brant*, 10 How. 348; *Myers* v. *Croft*, 13 Wall. 295; *Allison* v. *Hunter*, 9 Mo. 751; *Lamb* v. *Davenport*, 18 Wall. 307. Upon the issuance of a patent to the grantor, the title enures to the benefit of the grantee in fee. — *Dillingham* v. *Fisher*, 5 Wis. 475; *Camp* v. *Smith*, 2 Minn. 155; *Thompson* v. *Spencer*, 50 Cal. 532; *Harmer* v. *Morriss*, 1 McLean, 44. Upon the whole case. — *Shepley* v. *Cowan*, 1 Otto, 330.

GLOVER & SHEPLEY, for respondents.

LEWIS, P. J., delivered the opinion of the court.

Plaintiffs sue in ejectment for fractional section 9, township 44 north, range 7 east, containing thirty-seven and forty-one one-hundredths acres. Prior to the year 1800, a line was surveyed by Don Antonio Soulard for the northern boundary of Carondelet commons; commencing on the Mississippi River bank at a point known as the Sugar Loaf Mound, and running westwardly to the east line of the common-fields. The line thus located was marked by a brush fence, and was thenceforth considered and used by the villagers as the true northern boundary of their commons. The act of Congress of June 13, 1812, in confirming the commons to the several towns and villages named therein, respectively, provided that their outboundary lines should, in each case, be established by a survey. Under this authority, Elias Rector, a deputy United States surveyor, in 1816, surveyed and marked the outboundary of Carondelet commons, establishing their northern limit at a line nearly paralled with that run by Soulard from the Sugar

Loaf Mound, and about one mile south of it. In 1834, this Rector line was retraced and marked by Joseph C. Brown, a deputy United States surveyor, whose survey was approved and confirmed by the proper executive officers of the government. The area contained within the Rector and Soulard lines, with the river on the east and the common-fields on the west, covers the land in controversy. About the year 1835, Thomas Chartrand settled on the tract, and proceeded to fulfil the requisites for a right of preëmption according to the laws then in force. He made several attempts for an entry, but was denied permission by the local land-officers on account of the existing uncertainty about the commons boundary. In 1862, the Supreme Court of the United States decided the case of *Carondelet* v. *St. Louis*, holding that the true northern boundary was the line surveyed by Rector in 1816, and by Brown in 1834. The effect of this was to release the existing reservation, and to bring this tract into market, as other public lands. Chartrand having died in 1845, his heirs now proceeded, under the act of March 3, 1843, to consummate their ancestor's pre-emption right; and, after a controversy which underwent successive appeals from the register and receiver to the commissioner of the General Land-Office, and thence to the Secretary of the Interior, were permitted to enter the land in June, 1866. A patent to "the heirs of Thomas Chartrand" was issued July 21, 1866. Four years earlier, however, in 1862, some of the heirs had executed certain quitclaim conveyances to William M. McPherson and John Epes Cowan, which are here set up in defence against the plaintiffs' claim. After the issuance of the patent, the same grantors made conveyances to Samuel M. Coleman, under whose grantees the plaintiffs show title. The only question to be determined is, Were the deeds executed before the entry valid as against the conveyances made by the grantors after the date of the patent? The Circuit Court gave effect to the deeds executed before the entry; holding

them sufficient to convey the after-acquired title of the grantors. The court, sitting as a jury, found that plaintiffs had acquired one undivided third part of the lands by conveyances of interests not included among those set up by defendants, and rendered judgment accordingly. Plaintiffs appealed. There was a difference of opinion as to the extent of the interests conveyed by some of the deeds introduced for defendants. On this point, the rulings were in favor of the plaintiffs; and, as the defendants have not appealed, it is not now in controversy.

Two propositions are urged by counsel for the plaintiffs: *First*, That, until the entry was made and the purchase-money paid, neither Chartrand nor his heirs had any claim or interest in the land, and, therefore, there was nothing to convey; consequently, the deeds made in that period were void. *Second*, Even if the heirs held a preëmption right before the entry, their attempted conveyances were invalid by reason of the twelfth section of the act of Congress approved Sept. 4, 1841.

In support of the first proposition, it is insisted that, until the decision, in 1862, of *Carondelet* v. *St. Louis*, the land was in no sense public land, and no preëmption or possessory right of any sort could attach to it as such; that by virtue of actual occupancy by the villagers prior to Dec. 20, 1803, the land belonged to Carondelet, as part of her commons, under the act of June 13, 1812, and the Rector and Brown surveys could not diminish or interfere with that vested title. Counsel here seem to assume that the Supreme Court, in *Carondelet* v. *St. Louis*, did not question this proposition, but held only that Carondelet was, by reason of extrinsic facts, estopped from asserting her title, although well founded in historical truth. We do not so understand the opinion. The doctrine of the court was, in effect, that Carondelet never had any title to the land in controversy, as a part of her commons. The *syllabus* says: " The true construction of the act of 1812 is, that it

granted to the towns and villages therein named (and to Carondelet, among others) their lands used in common for pasturage, but reserved the authority to define the limits of those common lands by a survey.   *   *   *   Until a survey was made on the west and south, the villagers had no title on which they could sue, because their grant attached to no land, nor could a court of equity establish a boundary. If no legal or binding survey was made of the Carondelet common after the act of 1812, then the title remains to this day what it was at the passage of the act, — a vague claim for six thousand acres, without boundaries, and incapable of being judicially maintained.'' Such is the true force of the opinion. The court treated the Soulard survey as a nullity. *Carondelet* v. *St. Louis*, 1 Black, 179.

It thus appears that under the act of June 13, 1812, an authoritative survey of the outboundary was held essential to the consummation of a commons title. As no such survey ever included the land in controversy, it follows that no commons title ever attached to it for a moment. The distinction, in this particular, between commons, on the one hand, and town-lots and out-lots on the other, is carefully noted in the same opinion. Said Justice Catron: '' The case is different under the act of 1812, as to town-lots and out-lots, as there ( *West* v. *Cochran*, 17 How. 416) stated. Such lots, and the possession of them, could be shown and identified, as matter of evidence.'' Notwithstanding this clear distinction, counsel assiduously refer us to a number of decisions in which surveys were held unnecessary to complete the title ; all being in cases of town-lots, common-field lots, or out-lots, and therefore wholly inapplicable to the question before us.

Another argument for the first proposition is based upon an assumed effect of the act of March 3, 1853, which provides, '' that any settler who has settled, or may hereafter settle, on lands heretofore reserved on account of claims under French, Spanish, or other grants which have been or

shall be hereafter declared by the Supreme Court of the United States to be invalid, shall be entitled to all the rights of preëmption granted by this act and the act of fourth of September, eighteen hundred and forty-one, entitled ' An act to appropriate the proceeds of the public lands, and to grant preëmption rights,' after the lands shall have been released from reservation, in the same manner as if no reservation existed." Hence, it is assumed, the land was not open to any preëmption claim, nor could any shadow of right attach to it under the preëmption laws, until after the commons reservation was " declared invalid " by the United States Supreme Court, in 1862. We are here referred by counsel to *Shepley* v. *Cowan*, 1 Otto, 330, an authority which we find conclusive against the proposition it is cited to sustain. That decision was upon a controversy relating to the same land here in dispute, and involving the same preëmption claim herein considered, with certain rights thereto pertaining. The court held that while, as against the United States, Chartrand had, pending the reservation, acquired no vested right, yet as against McPherson, who claimed under an alleged conflicting grant, the steps taken by Chartrand to secure a preëmption had vested in him a substantial and controlling interest. Said the court: " So in this case, Chartrand, the ancestor, by his previous settlement, in 1835, upon the premises in controversy, and residence with his family, and application to prove his settlement and enter the land, obtained a better right to the premises, under the law then existing, than that acquired by McPherson by his subsequent State selection in 1849. * * * With the decision declaring the invalidity of the claim to the land in controversy, all obstacles previously interposed to the presentation of the claim of the heirs of Chartrand, and the proofs to establish it, were removed. According to the decisions in *Frisbie* v. *Whitney* and the Yosemite Valley case, Congress might then have withdrawn the land from settlement and preëmption and granted it to the State of

Missouri, or reserved it from sale for public purposes, and no vested right in Chartrand or his heirs, as against the United States, would have been invaded by its action; but having allowed by its subsisting legislation the acquisition of a right of preference, as against others, to the earliest settler or his heirs, the way was free to the prosecution of the claim of the heirs.''

It thus appears that during all the time after Chartrand's settlement, in 1835, he and his heirs held against all the world a right of preference in the purchase of the land from the United States, at the minimum price, whenever the proper authorities should determine to bring it into market. The final recognition of this right in the permitted entry and in the issuance of the patent, resulted, not from any thing that occurred after the release of the reservation, but from the settlement and improvement that had progressed during its continuance. The preëmption claim, although contingent, was during all this time a fixed fact, awaiting such action of the government as would ripen the conditional into a positive right. Such a claim may be said to differ in little or nothing from a preëmption secured on lands already declared public. In *Frisbie* v. *Whitney*, 9 Wall. 187, it was held that the preëmption laws '' do not confer on the preëmptor *in posse* any right or claim to be treated as the present proprietor of the land, in relation to the government. His settlement protects him from intrusion by others, but confers no right against the government.'' This language might pass for a paraphrase of the terms used in *Shepley* v. *Cowan*, in describing Chartrand's relation to the land in controversy. A preëmption right has always been held, in this State, to constitute, independently of congressional restrictions, an assignable interest in land. It may even suffice to sustain an action of ejectment. Wag. Stat. 558, sec. 2. Between the right secured by Chartrand, which was recognized in his heirs by the government, and the right secured by the ordinary

preëmptor of public land, we can perceive no such differ-
ence as should deny to one whatever transferable quality
may be found in the other.

The provision in the act of Sept. 4, 1841, which is re-
lied upon as fatal to the deeds executed before the entry,
appears, after a declaration of the terms upon which the
settler will be privileged to purchase, as follows: "All
assignments and transfers of the right hereby secured,
prior to the issuing of the patent, shall be null and void."
5 U. S. Stat. 456, sec. 12.

We must first determine what is meant by "the right
hereby secured." Obviously, this is neither the possession
nor the right of possession. It cannot be the title, or the
land itself; for these are not yet the property of the settler.
It is simply the right to be preferred over all other persons
in becoming a purchaser from the government at an estab-
lished price. Bearing this in mind, a glance at the inci-
dental features of antecedent and concurrent legislation on
the same subject will suffice to show the true application of
the limitation.

The act of Congress approved May 29, 1830, declares
that "all assignments and transfers of the right of preëmp-
tion given by this act, prior to the issuance of the patent,
shall be null and void." A supplementary act, approved
Jan. 23, 1832, provides that "all persons who have pur-
chased under an act entitled 'An act to grant preëmp-
tion rights to settlers upon public lands,' approved the
29th of May, 1830, may assign and transfer their certifi-
cates of purchase, or final receipts; and patents may issue
in the name of the assignee, any thing in the act aforesaid
to the contrary notwithstanding." So far as this con-
gressional interpretation affords any light, it appears that
the operation of the act of May 29, 1830, was to inhibit
such an assignment of the certificate of entry as would
enable the assignee to obtain a patent in his own name.
This being considered unnecessarily harsh, the supplemental

act was passed by way of relief. Various acts were afterwards adopted from time to time, slightly modifying the existing laws, until the act of Sept. 4, 1841, which was intended to embrace the substance of its predecessors, and which revived the restriction upon assignments, in the same terms, substantially, as appeared in the act of 1830, before its modification by the supplemental act of 1832. The leading purpose of the revival was, beyond doubt, to prevent an assignment of the *right of preëmption*, which might enable the assignee to enter the land and obtain a patent in his own name. It was doubtless intended, further, that no contest should ever arise between the settler and an alleged assignee, in which the latter might entrench himself behind the patent. So much, at least, could be accomplished without any interference with State laws regulating conveyances of possessory rights or equitable titles.

The evil which the restriction was designed to cure had prevailed in the form of temporary settlements and improvements for mere speculative purposes ; the pretended settler roving from tract to tract, putting up sham improvements and then selling out to land-hunters, who would contribute nothing to the progress of population and agricultural industry. Supplementary checks were provided in most of the acts, whereby the settler was required to make oath — during one period, before the entry, and during another, before obtaining the patent — to the effect that the purchase was made in his own name, for his own use and benefit, and not in trust for another. Under the act of Sept. 4, 1841, the oath prescribed for the original settlers is as follows :

"I, A. B., claiming the right of preëmption under the provisions of an act of Congress entitled 'An act to appropriate the proceeds of the sales of public lands, and to grant preëmption rights,' approved September 4, 1841, to the —— quarter of section number ——, subject to sale at ——, do solemnly swear (or affirm), that I have never had the bene-

fit of any right of preëmption under this act ; that I am not the owner of three hundred and twenty acres of land in any State or Territory of the United States ; nor have I settled upon and improved said land to sell the same on speculation, but in good faith to appropriate it to my own exclusive use or benefit ; and that I have not directly or indirectly made any agreement or contract, in any way or manner, with any person or persons whatever, by which the title which I may acquire from the government of the United States should enure, in whole or in part, to the benefit of any person except myself.

[Signed]    " A. B."

Thus stood the law, up to the passage of the act of March 3, 1843. The restriction upon alienation, however interpreted, was exclusively personal to the settler. Its purposes might be summed up in an intention to increase the number of actual settlers by confining the benefits of preëmption to individual ownerships of three hundred and twenty acres or less, and by preventing any settler from multiplying his privileges by repeating them in successive assignees.

In such a state of the law, there could be no transfer or devolution, by descent or otherwise, of the preëmption right, away from the person of the original settler. If he died, the right died with him. His heirs were then no better off than if their ancestor had never occupied or improved the land. The justice of Congress was invoked to obviate this particular result of the restriction. If the settler had, up to the time of his death, fulfilled the requisites of the law, its whole purpose was accomplished. He could not now alienate, or enable another to enjoy the benefits provided exclusively for himself. Congress itself, therefore, broke the spell by decreeing a devolution of the settler's privilege upon his heirs, who had done nothing under the preëmption regulations to earn it, and who could not, in the nature of things, take the oath which would have been

required of their ancestor. The act of March 3, 1843, provides: " That in any case where a party entitled to claim the benefits of any of the preëmption laws shall have died before consummating his claim by filing in due time all the papers essential to the establishment of the same, it shall be competent for the executor or administrator of the estate of such party, or one of the heirs, to file the necessary papers to complete the same ; *provided*, that the entry in such cases shall be made in favor of ' the heirs ' of the deceased preëmptor, and a patent thereon shall cause the title to enure to said heirs, as if their names had been specially mentioned."

Can it be maintained that Congress, in thus creating a new right in new parties, who are not pretended to have fulfilled any of the conditions of preëmption, meant to import into it the same limitations which attached in the hands of the actual settler? If so, the law is practically inoperative. None of those limitations are expressly repealed by this act. Interpretation, from the necessity of the case, discards some of them. Others must be alike discarded when it is manifest that their object is accomplished ; that their subject-matter no longer exists ; and that it would be burdensome and unjust to impose them upon persons to whom they are not literally applicable, and who are not, by any antecedent proceedings under the law, brought within its purview. The right conferred upon the heirs by the act of March 3, 1843, is not " the right hereby secured" under the act of Sept. 4, 1841, nor does it arise from any thing performed by them in obedience to its provisions. It is a right derived from the special bounty of Congress, which might, upon the death of the settler, have withdrawn the land from sale or have granted it to a stranger, without a violation of any pledge, expressed or implied. The oath which the heirs must take, upon making their entry, declares merely that their ancestor " was not, at the time of his death, the owner of three hundred and twenty acres of land in any State or

Territory of the United States; that he did not settle upon and improve the above tract of land on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might have acquired from the government of the United States should enure, in whole or in part, to the benefit of any person except himself."

Had it been supposed that the restriction upon alienation extended also to the heirs, the framers of the oath could not thus have omitted a declaration to the effect that the heirs themselves had not attempted to evade the restriction.

We conclude, from these general views of the subject-matter, that the limitation referred to in the act of Sept. 4, 1841, has no application to the rights secured to the heirs of the deceased settler under the act of March 3, 1843. It follows that the deeds executed by the heirs of Chartrand to McPherson and Cowan, conveying their equitable rights and interests in the land, which were afterwards merged in the patent, were valid and effectual to vest in the grantee the legal title thus matured.

All the judges concurring, the judgment is affirmed.